## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANCIS P. DIAMOND,<br><br>Plaintiff,<br><br>v.<br><br>MJH LIFE SCIENCES,<br><br>Defendant. | Civil Action No. 22-05368 (RK) (RLS)<br><br>**OPINION** |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court on Defendant MJH Life Sciences's ("Defendant") Motion for Summary Judgment. (ECF No. 27.) Plaintiff Francis P. Diamond ("Plaintiff") filed an opposition to the Motion, (ECF No. 32), and Defendant replied, (ECF No. 35). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

### I.    BACKGROUND

#### a.  Factual Background

    This matter stems from an employment dispute regarding Plaintiff's termination from Defendant's employ in February 2022. Plaintiff was hired by Defendant to work as the Managing Editor of an online and print magazine, *Infection Control Today*. The thrust of Defendant's arguments in favor of summary judgement is that Plaintiff's termination was the result of Plaintiff's inappropriate conduct towards his manager, Ms. Alexandra Ward Karas, ("Ms. Karas"). (*See generally,* "Def. Br.," ECF No. 28.) Plaintiff disagrees and argues that his termination was the result of age and disability discrimination by Defendant, as well as retaliation by Defendant

for actions undertaken by Plaintiff in connection with alleged age bias and a disability accommodation. (*See generally,* "Pl. Br.," ECF No. 32-2.)

The undisputed factual circumstances surrounding this matter are set forth in the parties' respective Statement and Counterstatement of Facts in accordance with Local Civil Rule 56.1.[1] (*See* "Def. SOF," ECF No. 28-1; "Pl. C-SOF," ECF No. 32 at 1–16.) Any disagreements among the parties as to a fact or characterization are noted herein.[2]

### i.    Plaintiff's Hiring and Disclosure of Disability

Plaintiff was hired by Defendant in November 2019 to work as the Managing Editor of an online and print magazine, *Infection Control Today*. (Def. SOF ¶¶ 1–2; Pl. C-SOF ¶ 2.) Plaintiff was sixty-two (62) years old when he was hired. (Pl. C-SOF ¶ 1.) Prior to being hired, Plaintiff had worked in publishing for more than 30 years. (*Id.* ¶ 3.)

During the hiring process, Plaintiff was interviewed by Ms. Karas, who later became Plaintiff's manager.[3] (Def. SOF ¶ 3; Pl. C-SOF ¶ 2.) Shortly after Plaintiff was hired, he informed Ms. Karas that he suffered from depression. (Def. SOF ¶ 6; Pl. C-SOF ¶ 7.) Since at least 2011,

---

[1] Both parties also provided a number of certified exhibits with their submissions. (*See* Decl. of Michael L. Fialkoff ("Fialkoff Decl."), ECF No. 28-2; Cert. of William J. Fox ("Fox Cert."), ECF No. 32-1 (exhibits), ECF No. 32-4 (counsel certification).)

[2] The parties also submitted responses to each other's respective Statement and Counterstatement of Facts. (*See* "Def. R-SOF," ECF No. 35-1; "Pl. R-SOF," ECF No. 32 at 16–25.) The Court notes that Plaintiff denies aspects of Defendant's Statement of Facts without pointing to any record evidence in support of its denials. (*See, e.g.*, Pl. RSOF ¶ 43, 46, 52, 63.) Federal Rule of Civil Procedure 56(c)(1) requires that a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(1); *see Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004) ("Under Federal Rule of Civil Procedure 56(e), when a party has filed a motion for summary judgment, 'an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'"). Therefore, the Court will rely on Defendant's Statement of Undisputed Material Facts where Plaintiff's denials in response are unsupported.

[3] At the time of Ms. Karas's deposition on September 21, 2023, she was thirty-four (34) years old. (Pl. C-SOF ¶ 2.)

Plaintiff had suffered from severe anxiety and depression, triggered by his wife's cancer diagnosis and his daughter's leaving for college.[4] (Pl. C-SOF ¶¶ 1, 4.) Plaintiff treats his anxiety and depression with Xanax and Wellbutrin, as well as quarterly counseling sessions with his primary care physician, Dr. Catherine Spratt Turner. (Pl. C-SOF ¶¶ 5–6.)

Plaintiff testified at his deposition that he told Ms. Karas, "I battle depression; and if for some reason it seems that I am misfiring or not interacting, just something not quite right, please feel free to take me aside and point that out to me and I will make the necessary adjustments; even if that's just to call it a day and try again tomorrow." ("Pl. Tr.," Fox Cert. at Ex. 2, at 39:3–9.) Plaintiff also testified that he "think[s]" he mentioned his depression to Ms. Karas "at least five times in e-mails or Teams messages," though he did not know for sure. (Pl. Tr. at 118:9–20.) Ms. Karas testified at her deposition that Plaintiff "mentioned he had a temper that he would try to control, and [that she] would always let him know when [she] felt his behavior was out of line."[5] ("Karas Tr.," Fox Cert. at Ex. 3, at 62:14–20.)

### ii.    Plaintiff's Work-From-Home Requests

Defendant's employees, including Plaintiff, worked from home at the outset of the COVID-19 pandemic. (Def. SOF ¶¶ 26, 31; Pl. C-SOF ¶ 9.) In August 2020, Plaintiff submitted to Defendant a note from Dr. Spratt Turner, which stated in part, "[d]ue to the pandemic and given [Plaintiff's] age and underlying medical conditions he is considered at risk for contracting Corona Virus. It is my recommendation that he continue to work from home until further notice." (Fialkoff

---

[4] Plaintiff's wife passed away in 2014. (Pl. C-SOF ¶ 4.)

[5] Ms. Karas testified that she could not "recall a single conversation where [Plaintiff] and [she] ever discussed a disability," (Karas Tr. at 52:8–9), and that she "did not know" that Plaintiff suffered from severe anxiety and depression during his employment with Defendant, (Karas Tr. at 53:6–9). Defendant has noted that for purposes of this motion it will admit "that Plaintiff told Ms. Karas about his diagnosis shortly after he was hired." (Def. R-SOF ¶ 7.)

Decl. at Ex. M.) In November 2020, Plaintiff made a request to Defendant for "permanent work-at-home status," copying Ms. Karas on his request. (Pl. C-SOF ¶ 30; Fox Cert. at Ex. 4.) He attached another note from Dr. Spratt Turner, which reiterated her belief that Plaintiff's "age and underlying medical conditions" put him at-risk for contracting coronavirus. (Fox Cert. at Ex. 4.)

Five months later, Plaintiff e-mailed Ms. Shari Lundenberg, ("Ms. Lundenberg"), Defendant's Human Resources Director, copying Ms. Karas, and asked Ms. Lundenberg to "reconfirm [her] acquiescence to [his] earlier request that [he] be granted permanent work-at-home status. [His] supervisor, [Ms. Karas], has said that she has no problem with this." (Fox Cert. at Ex. 5; Pl. C-SOF ¶ 32.) After Ms. Lundenberg responded and let Plaintiff know that Defendant would be "reviewing any requests" and would get back to him, Plaintiff followed up with "documentation that [Ms. Lundenberg could] use in [her] review," again copying Ms. Karas on the e-mail. (Fox Cert. at Ex. 5.) He attached another note from Dr. Spratt Turner, which read, "I am writing on behalf of [Plaintiff] who is under my medical care. I have been treating him for severe anxiety and depression since 2011." (Pl. C-SOF ¶ 34.) Ultimately, Plaintiff was permitted to work from home from the outset of the COVID-19 pandemic until his termination nearly two years later. (Def. SOF ¶ 31.) Ms. Karas testified that no other employee she managed had ever "asked for an accommodation or was receiving an accommodation," (Pl. C-SOF ¶ 53), but that she and Plaintiff "had discussed his work from home situation" and Defendant was "more than happy to allow that given the fact that he was disruptive." (Karas Tr. 63:19–23.)

### iii.    Difficulties Between Plaintiff and Ms. Karas

Ms. Karas testified that while Plaintiff worked for Defendant, he "got his work done," and was never placed on a performance improvement plan.[6] (Karas Tr. at 36:2–9.) However, Ms. Karas

---

[6] Plaintiff also received pay raises and bonuses from Defendant in 2020 and 2021. (Pl. C-SOF ¶ 11.)

testified that when employees began working from home during the COVID-19 pandemic, "there started to be instances where [Plaintiff's] behavior would veer . . . [she] noticed that he would have these outbursts, angry outbursts, on more than one occasion, mostly in response to any sort of constructive feedback that [she] would give him, and that would happen periodically." (Karas Tr. at 44:15–45:12.) Plaintiff admitted that he could "get irritable sometimes" and "sometimes" directed his irritability at Ms. Karas. (Pl. Tr. at 38:6–12.) The parties' Statement and Counterstatement of Facts detail a number of occasions evidencing difficulties between the pair, as described in detail below.

In August 2020, Ms. Karas e-mailed Plaintiff a "[g]eneral note about copy," writing, "Lots of AMA numeral issues and mixed capitalization in headlines . . . numbers should be numerals, not spelled out. Too late in the game to go through now, but just keep in mind for copy moving forward please." (Fialkoff Decl. at Ex. G.) Plaintiff responded the next morning, writing as if he were Ms. Karas:

> Hi Frank.
>
> I just wanted to drop a quick note to you to thank you for all the hard work and dedication that you've exhibited over the last few months in turning a moribund publication around and breathing some life into it. You work many hours, and you are an excellent editor and writer. Circumstances have forced me to throw you into the deep end time and again, and you've managed to produce a quality product. There were some mistakes that I found in the current issue, but those would have been snagged if I had had the time to do my editing to it sooner. That's why we usually have more than one editor go over copy before it's put in pages. I do try to keep in mind that you're a one-man band, but you've exhibited marvelous grace under pressure. That has not gone unnoticed.
>
> Cordially,
> Allie.

(*Id.*) Plaintiff testified that he was pretending to be Ms. Karas to "show[] her the e-mail that [he] thought he] deserved to have gotten from her." (Pl. Tr. at 51:25–52:4.) Plaintiff then sent Ms.

Karas a Microsoft Teams message stating, "*[a]bout your notes to me on the ICT issue? Could you be any more of an insufferable know-it-all? I work my ass off for you and I get a note like that*?" (Def. SOF ¶ 13; Fialkoff Decl. at Ex. H.) (emphasis added.) Plaintiff testified that he and Ms. Karas then discussed his communications, and "she more or less said that I was being disrespectful and I said I don't think I was and we left it at that." (Pl. Tr. at 53:11–14.) He later "thought about it" and sent Ms. Karas an apology because he "wanted to tell her as human being to human being, I apologize. I shouldn't have said that to you." (Pl. Tr. at 46:20–47:5.) Ms. Karas did not report this incident to Human Resources and did not "have any proof" that her manager, Silas Inman, ("Mr. Inman"), reported it, either. (Karas Tr. at 48:17–20.)

Plaintiff and Ms. Karas had the following exchange over Microsoft Teams in the summer of 2020 or 2021[7] in response to Plaintiff being "asked to do things [he] wasn't trained to do[.]" (Pl. Tr. at 56:1–3):

> Plaintiff: "OK. But I can't know this shit by fucking osmosis."
>
> Ms. Karas: "I'm not sure why you're cussing at me. It's no big deal, as I said. Just next time, let's get into a routine of sending the content closer to the email send date. If anything, it's annoying that they set it up so early."
>
> Plaintiff: "OK. Apologies. I wasn't cursing at you, but at the situation."
>
> Ms. Karas: "There's no issue here at all. I was just asking if we can send content a little later in the week even though they originate the ticket so early."

(Fialkoff Decl. at Ex. J.)

Some months later, on November 5, 2021, Plaintiff and Ms. Karas were e-mailing about Plaintiff's Internet troubles on a loaner laptop. (Fialkoff Decl. at Ex. K.) In response to Ms. Karas letting Plaintiff know there was "not much else [she] could do," Plaintiff replied, "It's not your

---

[7] Plaintiff testified he could not remember what year the exchange occurred. (Pl. Tr. at 57:3–6.)

fault at all. I'm pissed off at the situation. [. . .] All I want to do is the best job I can do but modern corporations seem intent on blocking people from doing that with this sort of Mickey Mouse bullshit. Just fix the machine. That's not too much to ask." (*Id.*)

Ms. Karas also recalled "one instance in a group setting where [Plaintiff] had another outburst. He went on a sort of rant." (Karas Tr. 74:21–22.) However, she did not recall specifically what Plaintiff said. (*Id.* at 74:23–25 (noting "[i]t was something to do with unions").)

On December 8, 2021, Plaintiff and Ms. Karas were messaging on Microsoft Teams regarding the studies that the magazine was covering:

> Plaintiff: "These studies. Please just shoot me."
>
> Ms. Karas: "These studies are what our audience is keeping up with and reading day in and o[ut]. They're the foundation of our site [. . .]"
>
> Plaintiff: "[. . .] Here's a snapshot of the top 10 articles from January, 3 of which seem to be generated by studies. But sure, more studies. [. . .] I was merely venting a bit. No biggie."
>
> Ms. Karas: "We need to be covering and commenting on what the latest data find, across all the core concepts [. . .]"
>
> Plaintiff: "The print editions and the website are vastly improved over the last year. But yeah, in general more studies. I agree. I've worked my ass off for you over the last two years. Anything you've asked me to do, I've done. When I complained about the studies I was just venting a bit. Just kind of joking. I am a little dazed by the reaction. Am I getting set for another crap raise?"
>
> Ms. Karas: "I think we both want the site to be as strong as it can be, and honing in on WHO we are attracting to [the] site is of the utmost importance here as audience data becomes more and more of a priority for our business. I suggested some more coverage of studies/trial results, which you just agreed with."
>
> Plaintiff: "'These studies. Please just shoot me.' BOSS: 'LOL. Yeah, they can be tough to handle but you're improving and it will become second nature eventually. Try to have fun with them. I have faith in you.'"
>
> Ms. Karas: "It's totally within your right to feel as though I should have responded in a different way. The disre[spectful] message, though, is not appropriate."

Plaintiff: "What disrespectful message? Oh. That one. That's called deesculating [sic]. I have great respect for you and you know it. Please don't try to hang that one on me. I'm calling."

Ms. Karas: "This conversation is not the way to respond to your manager. We can pick this up at a later time once [we've] both calmed down."

(Fialkoff Decl. at Ex. P.) Ms. Karas subsequently sent a screenshot of the messages to Mr. Inman, writing, "It's been a while. We were due for a [Plaintiff] blowup." (Fox Cert. at Ex. 11.) Mr. Inman replied, "Never a dull moment." (*Id.*) Ms. Karas responded, "Batshit crazy. I'm about ready to formally report him to HR." (*Id.*)

Ms. Karas e-mailed Ms. Lundenberg that same day, writing "I'm wondering what the recourse is for dealing with a consistently disrespectful employee. Is there any sort of disciplinary write-up process or warning? A PIP doesn't seem appropriate in this situation because job performance itself is OK. It's core values/attitude that are a consistent problem." (Fialkoff Decl. at Ex. Q.) The two met the next day. (Def. SOF ¶ 43.) Ms. Karas testified that she recommended to Ms. Lundenberg that Plaintiff be terminated, and Ms. Lundenberg agreed that Defendant could "go ahead and post a job to fill the position prior to [Plaintiff's] termination."[8] (Karas Tr. at 72:10–22; Lundenberg Tr. at 32:9–14 (noting the decision to terminate Plaintiff was made in December 2021).) The parties dispute who was ultimately responsible for the decision to terminate Plaintiff—whether it was Ms. Lundenberg, (Pl. C-SOF ¶ 59), or a collaboration of Ms. Karas and Mr. Inman, (Def. SOF ¶ 47).

---

[8] Mr. Inman and Ms. Lundenberg both testified that the delay between the decision to terminate Plaintiff's employment and his actual termination was due to Defendant first wanting to find Plaintiff's replacement. (*See* "Inman Tr.," Fialkoff Decl. at Ex. E, at 68:15–17 ("We wanted to backfill the role first."); "Lundenberg Tr.," Fox Cert. at Ex. 6, at 33:19–23 ("We were looking for a replacement.").)

iv.     *Plaintiff's Age-Related Concerns*

Defendant required all its employees to complete a self-evaluation Individual Development Plan, ("IDP"). (Def. SOF ¶ 52.) Plaintiff completed an IDP in the spring of 2020 ("2020 IDP," Fialkoff Decl. at Ex. R), and another IDP at the end of 2021, ("2021 IDP," Fialkoff Decl. at Ex S). (Def. SOF ¶ 51.) Relevant to the instant matter, the IDP form asked questions regarding "[c]areer [a]spirations," including "[s]hort-term goals (1-2 years): What do you need to accomplish to take your performance to the next level? What are your professional development goals for the next 1-2 years?" and "Long-term goals (3-5 years): What are your professional development/career aspirations (where do you want to be) in the next 3-5 years?" (2020 IDP at 1; 2021 IDP at 1.) In his 2020 IDP, Plaintiff's responses were fairly standard, with statements like, "[I want] [t]o make *Infection Control Today* the publication that those on the frontlines of infection control and prevention turn to . . .," and "[I] would like to expand ICT's readership . . ." (2020 IDP at 1.)

In his 2021 IDP, Plaintiff's responses, while still generally innocuous, were prefaced by Plaintiff's views on having to fill out the IDP at his age. For example, in response to the first question about his short-term goals, Plaintiff started out by writing, "First, I'd like to go on record as saying this Individual Development Plan is geared for an age cohort of which I am not a part. I will give it my best shot, though." (2021 IDP at 1.) Throughout much of the remainder of the 2021 IDP, Plaintiff prefaced his responses in a similar fashion, writing things like "Again, this is not a relevant question for where I am in my career," and "Again, not really relevant for someone in my age group," and "[F]orgive me for sounding like a broken record, this is not really relevant for someone at my stage in my career." (2021 IDP at 1–2.)

Plaintiff testified that his "feeling about [the IDP] was it was geared to people who were a lot younger than [he was] . . . ," (Pl. Tr. at 156:22–25), and that "you don't need to give an IDP to

people 62 years old along these lines. It should be a different type of IDP[.]" (Pl. Tr. at 158:23–159:2.) Of note, Ms. Karas did not review Plaintiff's 2021 IDP until after the decision to seek a replacement for his position had already been made. (Def. SOF ¶ 63.)

In terms of other concerns Plaintiff raised, Plaintiff testified that Ms. Karas once told him "anybody under 40 would not know what you're talking about" when Plaintiff referred to himself as a "Luddite." (Pl. Tr. at 145:13–25.) Another time, Ms. Karas told him "nobody in my generation does calling," in response to Plaintiff telling Ms. Karas she would have to give someone a phone call in order to reach them. (*Id.* at 146:2–13.) Plaintiff testified that he "didn't at the time take offense [to these interactions], because of banter." (*Id.* at 145:13–17.)

> *v.    Plaintiff's Termination*

Plaintiff was advised he was being terminated on February 11, 2022. (Def. SOF ¶ 48.) He was sixty-four (64) years old. (Def. SOF ¶ 49.) Plaintiff was not provided a written explanation detailing the reason behind his termination, (Pl. C-SOF ¶ 71), and Ms. Karas testified that Plaintiff was not given advance notice of his termination. (Pl. C-SOF ¶ 54.) Plaintiff's replacement, Ms. Tori Whitacre, was officially hired on February 14, 2022. (Fox Cert. at Ex 12.) Ms. Whitacre was fifty-one (51) years old, and she was permitted to work from home. (Def. SOF ¶¶ 50, 74; Pl. R-SOF ¶ 74.)

> b.    <u>Procedural Background</u>

On August 30, 2022, Plaintiff filed the subject action in the Superior Court of New Jersey, Law Division, Middlesex County. (*See* ECF No. 1 at 6–12.) Plaintiff asserts three causes of action: age discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD") (Count I); disability discrimination in violation of the NJLAD (Count II); and retaliation in violation of the NJLAD (Count III). (*See id.*)

Defendant removed this action to federal court on September 1, 2022.[9] (*See* ECF No. 1.) Following the close of discovery, Defendant filed a Motion for Summary Judgment, which is now pending before this Court. (ECF No. 27.) Plaintiff opposed Defendant's motion, ("Pl. Br.," ECF No. 32-2. and Defendant replied, ("Def. Reply," ECF No. 35).

## II.    LEGAL STANDARD

### a.    Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Id*. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino*, 358 F. 3d at 247 (quoting *Anderson*, 477 U.S. at 255).

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not

---

[9] This case was initially assigned to the Honorable Peter G. Sheridan, USDJ (ret.). Thereafter, the Court considered a letter from Defendant with respect to whether complete diversity existed for purposes of subject matter jurisdiction. (ECF No. 30 (citing *Park v. Tsiavos*, 165 F. Supp. 3d 191, 199 (D.N.J. 2016)).) It appears Judge Sheridan was satisfied with Defendant's explanation, as his next order was to re-set the return date to allow the Motion for Summary Judgment to be fully briefed. (ECF No. 34.)

genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Celotex Corp.*, 477 U.S. at 322–23 ("[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."). Summary judgment should be denied "[i]f reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51.

### b. *McDonnell Douglas* Framework

NJLAD claims are analyzed under the three-step burden shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (collecting cases). Under this test, a plaintiff must "carry the initial burden under the statute of establishing a *prima facie* case of [unlawful] discrimination," or alternatively, a *prima facie* case of retaliation. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff establishes a *prima facie* case of discrimination or retaliation, "the burden of *production* shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 763 (emphasis in original). This reason, however, "need not . . . actually motivate[] the [employment] decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)) (brackets in original). This is because "throughout this burden-shifting paradigm, the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763. Moreover, the Third Circuit has described the employer's responsibility in the second-prong as a "light burden." *Id.*

If the employer proffers "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," the burden shifts back to the plaintiff to demonstrate "by a preponderance of the evidence that the employer's explanation is pretextual." *Id.* The plaintiff "bears the final burden to demonstrate . . . through evidence that the [employer's] provided rationale is false or that the real reason for the adverse action was discriminatory or retaliatory animus." *Valente v. PNC Bank*, No. 20-01710, 2023 WL 5608943, at *4.

A plaintiff may demonstrate pretext in two ways. *See Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80 (3d Cir. 2015). The plaintiff "must present some evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). As the Third Circuit has explained:

> [T]he nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

> the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108–09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765).

### III.    DISCUSSION

Defendant moves for summary judgment in their favor on all counts. (*See generally*, Def. Br.) While Defendant assumes Plaintiff has made out a *prima facie* case of unlawful age discrimination, Defendant argues that Plaintiff fails to make out a *prima facie* case of unlawful disability discrimination and retaliation under the NJLAD. However, Defendant argues that even assuming Plaintiff has been able to make out a *prima facie* case on all counts, Defendant has set forth a legitimate, non-discriminatory reason for Plaintiff's termination: repeated improper and unprofessional conduct towards his manager, Ms. Karas. Further, Defendant claims that Plaintiff has failed to demonstrate this reason is pretextual, which entitles Defendant to summary judgment on all counts.

The Court will address each of Plaintiff's claims of discrimination and retaliation in turn.

#### a.    Age Discrimination

In order to make out a *prima facie* case of age discrimination under the *McDonnell Douglas* framework, Plaintiff must demonstrate that he "(1) is a member of the protected class, (2) was qualified for the position held, (3) suffered an adverse employment action, and (4) 'ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.'" *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 938 (3d Cir. 2009) (quoting *Monaco*, 359 F.3d at 300).

14

Defendant assumes Plaintiff has made out the *prima facie* case.[10] (*See* Br. at 22.) However, Defendant contends it has sufficiently articulated a legitimate, non-discriminatory reason for Plaintiff's termination—Plaintiff's inappropriate conduct towards his manager, Ms. Karas. (Def. Br. at 22–23.) Defendant points to multiple occasions where Plaintiff's conduct crossed the line, including but not limited to, when Plaintiff provocatively mimicked, in a condescending manner, Ms. Karas by sending an imagined e-mail and Microsoft Teams message as if written from her perspective, (Fialkoff Decl. at Exs. G, P), when Plaintiff asked Ms. Karas if she "[c]ould [] be any more of an insufferable know-it-all," (*id.* at Ex. H), and when Plaintiff sent multiple messages and e-mails to Ms. Karas that included profanities (*see, e.g.*, *id.* at Exs. H, J, K, P). Plaintiff apologized to Ms. Karas for this conduct on multiple occasions, (*see id.* at Ex. J; Pl. Tr. at 47:7–11), and by Plaintiff's own admission, he acted "eradictly" [sic] on at least two of those occasions, (*see* Pl. Br. at 11 (noting Plaintiff acted "eradictly" [sic] on the two occasions he mimicked Ms. Karas)). Plaintiff has not raised a genuine dispute of material fact with respect to whether these incidents took place.

Accordingly, based on these unprofessional interactions between Plaintiff and Ms. Karas, Defendant has clearly made out a legitimate, non-discriminatory reason for its termination of Plaintiff. Disruptive behavior, such as Plaintiff's inappropriate conduct towards Ms. Karas, is a legitimate, non-discriminatory reason to terminate someone's employment. *See, e.g.*, *Magnusson v. The Hartford*, 258 F. App'x 444, 446 (3d Cir. 2007) (affirming district court's finding that

---

[10] The Court finds that it is likely that a reasonable factfinder would find Plaintiff made out the *prima facie* case here. Plaintiff was between sixty-two (62) and sixty-four (64) years old while employed by Defendant. (Def. SOF ¶¶ 4, 49.) Defendant has not put forth any evidence that Plaintiff was not qualified for the position of Managing Editor of *Infection Control Today*, and Plaintiff obviously suffered an adverse employment action when he was terminated on February 11, 2022. (*Id.* ¶ 48.) There is also no dispute that Plaintiff was ultimately replaced by someone sufficiently younger. (*See id.* ¶ 50 ("Plaintiff's replacement was 51 when she was hired.").)

profanity muttered during conference call satisfied employer's "relatively light" burden to articulate "a legitimate reason for the unfavorable employment decision"); *Cruz v. Trane Inc.*, No. 19-07324, 2022 WL 1442158, at *10 (D.N.J. May 5, 2022) ("It is undisputed that [plaintiff] was ultimately suspended for disruptive conduct pertaining to a conflict with one of his subordinates."); *Lopez v. Lopez*, 997 F. Supp. 2d 256, 271 (D.N.J. 2014) ("[T]he record, including [p]laintiff[']s deposition testimony, is replete with references to [p]laintiff[']s disruptive conduct.") A reasonable factfinder would conclude that Ms. Karas reached a breaking point when the final altercation between her and Plaintiff occurred in December 2021, wherein Plaintiff yet again messaged Ms. Karas profanities and mimicked her in an effort to illustrate how he wanted to be spoken to. (Fialkoff Decl. at Ex. P; *see also* Karas Tr. at 45:9–12 ("It started to escalate into name calling, mocking me, using profanity directed at me, and it got to a point where I could no longer tolerate that kind of mistreatment.").) In Ms. Karas's e-mail to Ms. Lundenberg following this final altercation, she characterized Plaintiff as a "consistently disrespectful employee," with "core values/attitude" being a "consistent problem." (Fialkoff Decl. at Ex. Q.) Here, Defendant has put forth sufficient evidence for a reasonable factfinder to conclude that Plaintiff's inappropriate conduct towards Ms. Karas was a legitimate, nondiscriminatory reason for his discharge.

Turning to pretext, Plaintiff asks the Court to make a number of illogical leaps to find a genuine dispute of material fact with respect to alleged discriminatory animus by Defendant. First, Plaintiff argues Ms. Karas "adamantly dismissed Plaintiff's complaints of age bias in the [2021] IDP and did not take them seriously." (Pl. Br. at 13.) Plaintiff seems to be suggesting that Ms. Karas's purported "dismissal" of Plaintiff's 2021 IDP responses somehow leads to an inference of underlying animus by Defendant. However, Plaintiff's argument misstates Ms. Karas's reaction to Plaintiff's 2021 IDP. Ms. Karas explained that she did not take Plaintiff's IDP responses to be

raising age discrimination because, "just the year prior [Plaintiff] filled out this exact document with no problem. This one is filled with a lot of sarcasm and a lot of inappropriate, in my opinion, tone." (Karas Tr. at 85:4–11.) Ms. Karas also testified, "[a]t the time this was received, we had already posted [Plaintiff's] job, so we were already clear that we were terminating him. If anything, when I received this I was disappointed that he didn't take the exercise seriously because just a year prior he had filled this out with no problem and we actually had a constructive conversation about his development." (*Id.* at 86:1–7.)

What's more, Ms. Karas was part of Plaintiff's hiring process and testified she "would have given [her] recommendation" to hire Plaintiff, which Mr. Inman "would have signed off on." (Karas Tr. at 29:20–23); *see Young v. Hobart W. Grp.*, 897 A.2d 1063, 1070 (App. Div. 2005) (noting the fact the same person who promoted plaintiff was also the person that later eliminated plaintiff's position "strongly counters against an inference of age discrimination"). No reasonable factfinder could conclude that Defendant's articulated reason for terminating Plaintiff is worthy of disbelief, or that a more invidious reason is more likely, particularly because Plaintiff has not established a genuine dispute of material fact with respect to the incidents between Plaintiff and Ms. Karas that Defendant argues led to his termination.

Next, Plaintiff argues that the ages of Ms. Karas, Ms. Lundenberg, and Mr. Inman lead to an inference of age discrimination, without pointing to any law in support of this proposition. At the time of their depositions, Ms. Karas was thirty-four (34) years old, Ms. Lundenberg was fifty-one (51) years old, and Mr. Inman was thirty-seven (37) years old. (Pl. C-SOF ¶¶ 2, 58, 68.) Plaintiff also argues, without citing to any record evidence, that "[t]he majority of Plaintiff's coworkers were 10 to 35 years younger than Plaintiff." (Pl. Br. at 13; *see also* Fox Cert. at Ex.1.) However, the simple fact that Plaintiff's superiors and co-workers were younger than him does not

support a finding of pretext. *See Britton v. Oil City Area Sch. Dist.*, 744 F. App'x 53, 57 (3d Cir. 2018) (noting "[t]hat the remaining employees were younger is not probative of [Defendant's] motive").

Finally, Plaintiff argues that Ms. Karas "may as well as called [Plaintiff] an 'old bat' or an 'old cook,'" (Opp. at 13), in her December 8, 2021 exchange with Mr. Inman wherein Ms. Karas messaged "[b]atshit crazy" after sharing a screenshot with Mr. Inman of her messages with Plaintiff. (Fox Cert. at Ex. 11.) As Defendant correctly argues, "Plaintiff is putting words in Ms. Karas's mouth that she did not say." (Def. Reply at 5.) Ms. Karas never referred to Plaintiff as "old" in her messages with Mr. Inman. "[P]ossibilities or conjectures of pretext are insufficient to overcome summary judgment." *Robinson v. Nat'l Med. Care, Inc.*, 897 F. Supp. 184, 187 (E.D. Pa. 1995), *aff'd*, 77 F.3d 463 (3d Cir. 1996); *see Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.") Therefore, the Court finds that no reasonable factfinder could conclude Defendant's real reason for Plaintiff's termination was age discrimination, when such a claim would be based on Plaintiff's pure conjecture.

While not addressed in Plaintiff's opposition brief, Plaintiff also testified about two additional statements by Ms. Karas that he believed could be construed as derogatory comments about his age. First, Plaintiff testified that Ms. Karas told him "anybody under 40 would not know what [he was] talking about" when Plaintiff referred to himself as a "Luddite." (Pl. Tr. at 145:13–146:1.) Another time, Ms. Karas told him "nobody in [her] generation does calling," in response to Plaintiff telling Ms. Karas to give someone a call. (*Id.* at 146:2–13.) No reasonable factfinder could conclude that, based on these two off-hand remarks about generational differences, Defendant's reason for terminating Plaintiff, who evidenced significant and repeated temperament

issues, was pretextual. *See, e.g.*, *Ruggiero v. Eli Lilly & Co.*, No. 19-16206, 2022 WL 17082498, at *4 (D.N.J. Nov. 18, 2022) ("But even comments that improperly reference . . . age are not necessarily enough to sustain an age discrimination claim under the NJLAD if they do not rise to the level of severe or pervasive."); *Guinan v. Boston Coll.*, No. 05-10805, 2006 WL 2987045, at *7–8 (D. Mass. Sept. 29, 2006) ("No reasonable jury could conclude that [Defendant] engaged in age discrimination based upon his suggestion that [Plaintiff]'s poor performance could be a result of 'generational differences.'").

Plaintiff's arguments in favor of a finding of pretext fail to contest any of the clearly objectionable conduct, attitude, and erratic demeanor that Defendant articulated in setting forth its legitimate reason for Plaintiff's termination. Further, Plaintiff fails to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) (emphasis in original)). Therefore, because no reasonable factfinder could conclude based on the record that Defendant's reason for Plaintiff's termination was a pretext for age discrimination, Defendant's Motion for Summary Judgment with respect to Plaintiff's age discrimination claim under the NJLAD is granted.

### b. Disability Discrimination

To establish a *prima facie* case of disability discrimination, the *McDonnel Douglas* framework requires Plaintiff to demonstrate that:

(1) [he] is the member of a protected class, specifically that [he] has or is perceived to have a disability as defined by the NJLAD;
(2) [he] was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer;
(3) [he] experienced an adverse employment action; and
(4) the employer sought someone else to perform the same work, or did fill the position with a similarly-qualified person.

*Kancherla v. Lincoln Tech. Inst., Inc.*, No. 14-7784, 2018 WL 922126, at *14 (D.N.J. Feb. 15, 2018) (quoting *Tourtellotte*, 636 Fed. App'x. at 848).

Defendant argues that Plaintiff cannot make out a *prima facie* case of disability discrimination because he cannot establish his termination was caused by his disability. (Def. Br. at 28–30); *see, e.g.*, *Gross v. Tris Pharma, Inc.*, 2023 WL 3597723, at *4 (D.N.J. May 22, 2023) (noting third element of a disability discrimination claim requires a showing plaintiff a "has suffered an adverse employment action because of that disability"); *Rich v. State*, 294 F. Supp. 3d 266, 278 (D.N.J. 2018) (framing third element as "[p]laintiff suffered an adverse employment action because of the handicap or disability").

Defendant assumes as true for purposes of this Motion that Plaintiff told Ms. Karas about his depression (which, along with his severe anxiety, make up his disability) shortly after he was hired. (Def. Br. at 28–29.) As such, Defendant argues that because Plaintiff was not terminated for nearly two years, Plaintiff cannot establish a causal connection between Defendant learning of his disability and his termination. (*Id.* at 29.) It is true that courts consider "temporal proximity" in assessing whether a "causal link" exists between a disability and an adverse employment decision. *See Gross*, 2023 WL 3597723, at *5 ("Courts 'consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment,' including temporal proximity, antagonistic comments, discriminatory animus, and inconsistencies in an employer's explanations for termination, among other things." (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007))). Here, a significant length of time—two years—passed between Plaintiff initially telling Ms. Karas about his disability and his termination. Even if Ms. Karas were to have only learned of Plaintiff's disability when he sought to reconfirm his work-from-home accommodation in April 2021, (*see* Fox Cert. at Ex. 5), her

20

knowledge of Plaintiff's disability still would not be sufficiently suggestive to create an inference of causation when Plaintiff's termination did not occur until February 2022. *See Bazargani v. Haverford State Hosp.*, 90 F. Supp. 2d 643, 654 (E.D. Pa. 2000), *aff'd*, 33 F. App'x 647 (3d Cir. 2002) ("Nor does Dr. Altenor's knowledge of plaintiff's [EEOC charge] (approximately seventeen months prior to the adverse employment actions), by itself, establish a causal connection because of its remoteness in time.")

In addition, Plaintiff has not pointed to record evidence that would otherwise support an inference of causality. Plaintiff did not testify to any derogatory comments made by Ms. Karas with respect to his disability, (*see* Def. SOF ¶ 69; Pl. R-SOF ¶ 69), nor did Plaintiff point out any inconsistencies in Defendant's articulated reason for terminating Plaintiff beyond attacking Ms. Karas and Ms. Lundenberg's credibility at their depositions, (*see* Pl. Br. at 6–8), which the Court addresses below. Further, Defendant permitted Plaintiff to work from home from the beginning of the COVID-19 pandemic through his termination date—the only disability accommodation he requested. (Def. SOF ¶ 31.) Therefore, the Court finds that a reasonable factfinder could not conclude that Plaintiff has made out a *prima facie* case of disability discrimination given the tenuousness of a causal connection between Plaintiff's disability and his termination.

Even assuming, *arguendo,* that Plaintiff made out a *prima facie* case, the Court has already found that Defendant articulated a legitimate, non-discriminatory reason for Plaintiff's termination. Nevertheless, in an effort to establish a genuine dispute of material fact with respect to pretext, Plaintiff puts forth a number of unconvincing theories.

First, Plaintiff argues that "[t]o cover up the real reason that Plaintiff was discharged, Defendant concocted the idea that its key managers would deny knowing that Plaintiff had a disability." (Pl. Br. at 9.) Plaintiff points to portions of Ms. Karas's and Ms. Ludenberg's

deposition testimonies in which they neither recall discussing Plaintiff's anxiety and depression nor recall having reviewed Plaintiff's note from Dr. Spratt Turner that was attached to his work-from-home accommodation request and indicated that Plaintiff had severe anxiety and depression. (*Id.* at 6–8.) Ms. Karas testified that she did not discuss Plaintiff's work-from-home request with Ms. Lundenberg, and she did not recall Ms. Lundenberg contacting her with respect to permitting Plaintiff to work from home. (Karas Tr. at 61:17–24.)

More generally, she testified that she could not "recall a single instance of ever having any sort of conversation about a disability with [Plaintiff]" though Plaintiff had "mentioned he had a temper that he would try to control, and [that she] would always let him know when [she] felt his behavior was out of line." (*Id.* at 62:10–20.) Similarly, Ms. Lundenberg testified that she did not recall reading Dr. Spratt Turner's note. (Lundenberg Tr. at 13:7–10.) She also testified that she never discussed Plaintiff's anxiety and depression with Ms. Karas. (*See* Lundenberg Tr. at 12:13–16.)

Plaintiff argues that "[a] jury will not believe that Ms. Lundenberg did not open the attachment with the email" that contained Dr. Spratt Turner's note, and "when Ms. Karas was cc'ed on these emails, a jury would expect that she would open the attachment." (Pl. Br. at 10.) Plaintiff is clearly attempting to cast doubt by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence[.]'" *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir.1993)). However, Plaintiff's "evidence merely suggest[ing]" Ms. Lundenberg and Ms. Karas may have seen Dr. Spratt Turner's note "presents no serious challenge" to their credibility.[11] *Ball*

---

[11] To the extent Plaintiff also relies on the fact that Defendant did not have "any procedures or practices to log and document disabled employees receiving accommodations," (Pl. Br. at 10), as evidence of his cover-

*v. Einstein Cmty. Health Assocs., Inc.*, 514 F. App'x 196, 202 (3d Cir. 2013). The Court notes that both Ms. Lundenberg's and Ms. Karas's depositions took place over a year-and-a-half after Plaintiff's termination. (*See* Fox Cert. at Exs. 3, 6.) Thus, it is unsurprising that neither Ms. Karas nor Ms. Lundenberg could remember with perfect recall every detail and conversation regarding Plaintiff's employment. Furthermore, Ms. Lundenberg testified that she was "not looking at every single person's [work-from-home] request under a microscope" because "[d]uring the pandemic[,] managing 800 people and all the requests . . . not to return to office were not normal times." (Lundenberg Tr. at 14:20–15:1.)

Even assuming Ms. Ludenberg and Ms. Karas were aware of Plaintiff's disability, Plaintiff cannot point to any real evidence supporting his theory of a "cover up" by Defendant. Plaintiff's assertion is mere speculation. *See, e.g.*, *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215 (3d Cir. 2011) ("[M]ere speculation does not create genuine issues of material fact."); *Fitzgerald v. Nat'l R.R. Passenger Corp., (Amtrak)*, No. 23-2340, 2024 WL 771711, at *3 (3d Cir. Feb. 26, 2024) ("Fitzgerald, however, relies on only his own speculation and conjecture to demonstrate pretext, which is insufficient to defeat summary judgment."); *Williams v. Rowan Univ.*, No. 10-6542, 2014 WL 7011162, at *15 (D.N.J. Dec. 11, 2014) (quoting *Johnson v. Multi–Solutions, Inc.*, 493 Fed. Appx. 289, 292 (3d Cir. June 28, 2012)) ("An inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

---

up theory, the Court finds that there is nothing in the record to suggest Plaintiff's request for accommodation based on his disability was treated any differently from any other similar request by other employees of Defendant. Ms. Lundenberg's testimony was that Defendant "do[esn't] have a log" with respect to "employees who are receiving accommodation," not that Plaintiff's accommodation was somehow kept off of a pre-existing log. (*See* Lundenberg Tr. at 17:20–25.)

The record evidence shows Ms. Karas had "no problem with" Plaintiff's permanent work-from-home request, and Plaintiff does not dispute this fact. (*See* Fox Cert. at Ex. 5.) What's more, the record shows that all of Plaintiff's requests for accommodation from Defendant were granted—Plaintiff was permitted to work from home from the outset of the COVID-19 pandemic until his termination nearly two years later. (Def. SOF ¶ 31.) No reasonable factfinder could find pretext based upon such a speculative, specious allegation of a cover up.

Next, Plaintiff argues that the lack of formal discipline Plaintiff received after the various incidents between himself and Ms. Karas was actually because, "Defendant accepted this conduct as [sic] and accommodated Plaintiff because it resulted from his disability." (Pl. Br. at 9.) This theory ignores clear record evidence. While Ms. Karas testified that she was "not aware of any" written discipline given to Plaintiff while he was employed by Defendant, (Karas Tr. at 48:21–25), the record contains numerous references to Ms. Karas informally discussing Plaintiff's inappropriate behavior with him. (*See, e.g.*, Fialkoff Decl. at Ex. J ("I'm not sure why you're cussing at me."), *id.* at Ex. P ("The disrepe[ctful] message, though, is not appropriate."), *id.* ("This conversation is not the way to respond to your manager."); Karas Tr. at 63:9–12 ("I spoke with [Plaintiff] on every occasion where he was disrespectful or insubordinate or condescending to me until I could no longer tolerate the mistreatment.").) Indeed, Plaintiff acknowledged his improper conduct and unprofessional reactions, and apologized to Ms. Karas for his conduct on multiple occasions. (*See* Fialkoff Decl. at Ex. J; Pl. Tr. at 47:7–11.) Plaintiff has not claimed he was discriminated against because he did not receive some sort of formal disciplinary write-up, and the Court finds that a reasonable factfinder could not conclude that the lack of formal discipline in any way calls into doubt Defendant's articulated reason for Plaintiff's termination, particularly given the numerous examples of informal discipline received by Plaintiff in the record.

To the extent Plaintiff alternatively attempts to recast his difficulties with Ms. Karas as a by-product of his disability, the Court notes that it would have no basis to make such a finding. No expert evidence has been submitted in this matter. *See Delvecchio v. Twp. of Bridgewater*, 135 A.3d 954, 964 (N.J. 2016) (noting the factfinder "is guided by the testimony of witnesses qualified to assist it in understanding the disease or condition at issue in a given [NJLAD] case."). What's more, "[t]hough an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability." *Sever v. Henderson*, 220 F. App'x 159, 160 (3d Cir. 2007); *see also Salley v. Cir. City Stores, Inc.*, 160 F.3d 977, 982 (3d Cir. 1998) ("[T]here is no evidence that [Plaintiff's] addiction, as opposed to his drug-related misconduct, caused Circuit City to fire him."); *Walton v. Spherion Staffing LLC*, 152 F. Supp. 3d 403, 407 (E.D. Pa. 2015) ("A survey of federal case law supports Defendant's argument that a disabled person can be lawfully terminated for disability related misconduct—so long as the employer's explanation is not a pretext for discrimination.").

Plaintiff himself testified at his deposition that he would "get irritable sometimes" and "sometimes" directed that at Ms. Karas. (Pl. Tr. at 38:6–12.) He also testified that he "should not have sent a message like" his "insufferable know-it-all" message "to anybody." (*Id.* at 47:18–22.) Further, Plaintiff admitted he knew Ms. Karas found his behavior offensive, and that at least one communication to her was "probably over the line." (*Id.* at 45:12-20, 110:21–25.) No reasonable factfinder could find pretext based upon Plaintiff's attempt to characterize his inappropriate, unprofessional interactions with Ms. Karas as somehow protected as a by-product of his severe anxiety and depression.

Finally, Plaintiff again raises Ms. Karas's "batshit crazy" comment to Mr. Inman with respect to her December 8, 2021 altercation with Plaintiff as evidence that he was terminated for his disability. (Pl. Br. at 9; Fox Cert. at Ex. 11.). However, a single remark is not enough to survive Defendant's Motion for Summary Judgment, particularly when the rest of the record is devoid of derogatory remarks directed at Plaintiff, and Plaintiff testified that he did not recall Ms. Karas making any derogatory remarks regarding his disability. (*See* Def. SOF ¶ 69); *see, e.g., Taylor v. Amcor Flexibles Inc.*, 669 F. Supp. 2d 501, 511 (D.N.J. 2009), *aff'd*, 507 F. App'x 231 (3d Cir. 2012) ("The Court finds this to be simply a stray remark, which no reasonable jury could find Defendant's proffered reasons to be pretextual upon."); *Affinity Healthcare Grp. Voorhees, LLC v. Twp. of Voorhees*, 624 F. Supp. 3d 494, 517 (D.N.J. 2022), *aff'd*, No. 22-2769, 2024 WL 195471 (3d Cir. Jan. 18, 2024) ("More than a few stray remarks cherry-picked out of a transcript of as impressive of volume as this is required to survive Defendants' motion for summary judgment.") Similar to the Court's finding with regard to Plaintiff's age discrimination claim, Ms. Karas's stray comment is insufficient to lead a reasonable factfinder to disbelieve Defendant's articulated reason for Plaintiff's termination or that some sort of invidious discriminatory reason is a more likely motivator for Plaintiff's termination. Because no reasonable factfinder would conclude based on the record that Defendant's reason for Plaintiff's termination was a pretext for disability discrimination, Defendant's Motion for Summary Judgment with respect to Plaintiff's disability discrimination claim under the NJLAD is also granted.

    c.  <u>Retaliation</u>

Lastly, Plaintiff argues that he was retaliated against by Defendant in connection with actions he undertook pertaining to his age and his disability. In order to make out a *prima facie* case for retaliation under the *McDonnell Douglas* framework, Plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the

employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002).

The Court need not consider whether Plaintiff made out a *prima facie* case of retaliation, because assuming he did, Plaintiff argues pretext by relying on arguments the Court has already rejected. Plaintiff argues Defendant's reason for his termination was a pretext for retaliation based on "the same reasons set forth above regarding the argument on disability discrimination," as well as his prior argument that "Ms. Karas was put off by [Plaintiff's] age bias complaints" in his 2021 IDP. (*See* Pl. Br. at 11, 14.) The Court has already considered but rejected those arguments as unsupportive of a reasonable finding of pretext. Consequently, because a reasonable factfinder could not conclude Defendant's articulated reason for Plaintiff's termination was a pretext for retaliation, Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claim under the NJLAD is also granted.

**IV.**    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** on

all counts. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: September 21, 2024